[S. F. No. 5075.  In Bank.—June 20, 1911.]

# WILLARD R. ZIBBELL, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), et al., Appellants.

NEGLIGENCE—CONTRIBUTORY NEGLIGENCE WHEN QUESTION OF LAW OR FACT.—Whether or not a plaintiff has been guilty of contributory negligence is usually a question of fact. It is a question of law only when the evidence is of such a character that it will support no other legitimate inference than that he was so guilty. But even in such cases, it is never a question of pure law. The real decision of the question by the court is a decision of fact.

ID.—EVIDENCE ADMITTING OF BUT ONE INFERENCE.—When the evidence is such that the court is impelled to say that it is not in conflict on the facts, and that from them reasonable men can draw but one inference, which points unerringly to the negligence of the plaintiff contributing to his own injury, then, and only then, does the law step in and forbid the plaintiff a recovery.

ID.—DEFENDANT MUST PROVE CONTRIBUTORY NEGLIGENCE.—In this state, contributory negligence is a defense the burden of proving which rests upon the defendant, and it is not incumbent upon the plaintiff to establish affirmatively that he was free from negligence.

ID.—CONFLICT IN EVIDENCE.—While in every case of a true conflict in the evidence tending to establish contributory negligence, the determination and decision is for the jury, the conflict must, in fact, be real.

ID.—RAILROAD—NEGLIGENCE IN SWITCHING CARS IN FREIGHT YARD— FAILURE TO OBSERVE MOVING CARS.—In this action to recover damages for personal injuries suffered by the plaintiff, while he was walking in the night-time along a public highway which crossed the freight yard of the defendant railroad, as the result of a collision with moving freight cars which were then and there being silently switched from a side track, it is held, upon a review of the evidence, that it could not be said, as matter of law, that the plaintiff was guilty of contributory negligence in not observing the approaching cars, and that the question of his contributory negligence was properly submitted to the jury.

ID.—NEGLIGENCE OF ENGINEER IN CHARGE OF SWITCHING ENGINE— BRAKEMAN WITHOUT CONTROL OVER MOVEMENT OF CARS.—Where it is inferable from the evidence that the engineer in charge of the switching engine engaged in moving the cars being switched, was operating his train as it approached the crossing, without bell or whistle and at undue speed, and that he was coming into a straight

track from a dangerous side lead, and that by reason of the cars and the angle of this lead he could not see the conditions in front of his train, a judgment against him will be upheld. A judgment, however, against a brakeman, who was one of the switching crew, but who had nothing to do with the negligent moving of the cars which caused the injury, and no control over the acts of his fellow-servants, cannot be sustained.

ID.—JOINT TORT FEASORS—REVERSAL OF JUDGMENT AS TO ONE.—The rule of the common law that where an entire judgment against several joint tort feasors must be reversed as to one it must be reversed as to all, does not exist in this state, it having been modified by section 578 of the Code of Civil Procedure.

ID.—MEASURE OF DAMAGES—EVIDENCE OF LOSS OF EARNING CAPACITY—SALARY PAID IN PLAINTIFF'S BUSINESS.—In an action by one who was a professional breeder and trainer of trotting horses to recover damages for personal injuries, evidence is admissible, under the plea of general damage, of the amount of salary paid persons engaged in such business, who possessed the same degree of skill and experience as the plaintiff. Such evidence is directed, not to the prospective profits of a business, but to the loss of earning capacity of the plaintiff by reason of his injuries.

ID.—GENERAL ALLEGATION OF DAMAGE—EVIDENCE ADMISSIBLE UNDER.—Under the plea of general damages and to prove a loss of earning capacity, it is permissible to show what wages, salary, or emoluments, would be open to the plaintiff in a business, vocation, trade, or profession which he understands, and which he would have the right and ability to follow were it not for his incapacitating injuries.

ID.—PORTION OF DEPOSITION ADMITTED ON PARTICULAR POINT—EXCLUSION AS TO OTHER MATTERS.—Where a witness for the plaintiff in such an action, upon being interrogated upon a particular point, has read to him his deposition upon that point given at a prior occasion, it is not error, upon cross-examination, to exclude other testimony given by the witness on that occasion upon extraneous matters.

ID.—INSTRUCTIONS AS TO DAMAGES RECOVERABLE—COMPENSATORY DAMAGES.—Where the jury in such action was repeatedly, accurately, and carefully instructed that "the measure of damages is the amount which will compensate plaintiff for all the detriment proximately caused by the accident," an isolated instruction that they might "assess the damages in such sum as you believe, under all the circumstances of this case in evidence, the plaintiff ought to recover, not exceeding the amount claimed in the complaint," will not be deemed misleading, or as intimating that they were entitled to award anything other than compensatory damages in an amount established to their satisfaction by the evidence.

ID.—SPECIAL DAMAGE NOT ALLEGED—PROFITS NOT RECOVERABLE—LOSS OF EARNINGS.—Where the plaintiff did not allege any special dam-

age for loss of profits, the jury was properly instructed that this element of special damage should not enter into their computation—on the other hand, it was proper to instruct them that a loss of earnings—a direct loss, as distinguished from profits—a special or prospective loss—could be awarded under the general *ad damnum* clause of the complaint.

ID.—JUROR VISITING SCENE OF ACCIDENT—KNOWLEDGE OF IRREGULARITY DURING TRIAL—FAILURE TO OBJECT—NEW TRIAL.—An irregularity of one of the jurors in visiting the scene of the accident, on his own motion, during the progress of the trial, which fact became known to the defendant prior to the verdict, without any objection being then made, cannot be relied upon by the defendant as a ground for a new trial.

ID.—EXCESSIVE VERDICT—PROOF OF PASSION OR PREJUDICE.—The only means of discovering the existence of passion and prejudice as influencing a verdict is by comparing the amount of the verdict with the evidence before the trial court.

ID.—AWARD OF DAMAGES GROSSLY DISPROPORTIONATE.—It is only where the verdict is so grossly disproportionate to any reasonable limit of compensation warranted by the facts, as to shock the sense of justice, and raise at once a strong presumption that it is based on prejudice or passion rather than sober judgment, that the judge is at liberty to interpose his judgment as against that of the jury.

ID.—AWARD OF SEVENTY THOUSAND DOLLARS DAMAGES—SHOCKING CHARACTER OF INJURIES.—In the present case it is held that while the damages awarded—seventy thousand dollars—are very great, the shocking character of the injuries, the loss of both arms and one leg, the permanent loss of earning capacity, the inevitable disabilities and suffering endured and necessarily to be endured during the rest of plaintiff's probable life, present a case where the injuries are as grave as the damages are great, or at least, a case where there is no such marked disproportion between the character of the injuries and the award made for them as to suggest at once that the award was influenced by prejudice, passion, or corruption.

APPEAL from a judgment of the Superior Court of Fresno County and from an order refusing a new trial.    George E. Church, Judge.

The facts are stated in the opinion of the court.

L. L. Cory, and P. F. Dunne, for Appellants.

Sullivan & Sullivan, and Theo. J. Roche, and Evarts & Ewing, for Respondent.

HENSHAW, J.—This is an action to recover damages for personal injuries. The defendants are the Southern Pacific Company and certain of its employees in the charge and operation of a switch engine with the cars thereto attached, by which the injuries were,inflicted. The verdict of the jury was in favor of the plaintiff against all of the defendants. The appeal from the judgment and from the order denying their motion for a new trial is taken by all of the defendants.

The question most earnestly and elaborately argued by all the parties to this appeal is whether or not the evidence establishes the contributory negligence of plaintiff. The determination of this question necessarily involves consideration of the facts in evidence. Before entering upon this consideration, however, the rules of law governing the doctrine of contributory negligence require brief—though very brief—statement. We say very brief, for, while the zeal, industry, and research of counsel have been tireless in the collocation and presentation of the cases bearing upon the question,—in a jurisdiction such as this, where the subject has by this court received frequent and elaborate exposition, little can be gained by going afield for authorities. And this is so because of the very nature of the question involved. Whether or not a plaintiff has been guilty of contributory negligence is similar to the question whether or not the evidence in a criminal case is sufficient to sustain a verdict of guilty. It is usually a question of fact. It is a question of law only when the evidence is of such a character that it will support no other legitimate inference than that in the one case the plaintiff was guilty of contributory negligence, in the other case that there was not sufficient evidence to sustain the verdict. But even in such cases, while the question is said, and properly said, to be one of law, it is never a question of pure law. The real decision of the question by the court is a decision of fact. When the evidence is such that the court is impelled to say that it is not in conflict on the facts, and that from those facts reasonable men can draw but one inference, and that an inference pointing unerringly to the negligence of the plaintiff contributing to his own injury, then, and only then, does the law step in and forbid plaintiff a recovery. It must follow, therefore, that cases from other jurisdictions can be of value to such a consideration only when one may be found which parallels in all

its essential features the case under consideration. This, in the nature of things, can never, or rarely, happen. And even if such a case be found, it cannot in any true sense be said to settle the law. Its value will come from the persuasive force of its reasoning—not upon the law—but upon the facts to which the law forbidding the recovery has been applied.

The law of this state is so well settled that it may be briefly summarized. Contributory negligence is a defense the burden of proving which rests upon defendant. (*Schneider* v. *Market St. Ry. Co.*, 134 Cal. 482, [66 Pac. 734]; *Hutson* v. *Southern California Ry. Co.*, 150 Cal. 701, [89 Pac. 1093]. Therefore in this state it is not incumbent upon the plaintiff—as it is in certain other jurisdictions—to establish affirmatively that he was free from negligence. It is incumbent upon the defendant to establish the existence of plaintiff's contributing negligence. Again, the question whether or not a plaintiff has been guilty of contributory negligence is usually one of fact for the jury's verdict.

"It is only where no fact is left in doubt, and no deduction or inference other than negligence can be drawn by the jury from the evidence, that the court can say, as a matter of law, that contributory negligence is established. Even where the facts are undisputed, if reasonable minds might draw different conclusions upon the question of negligence, the question is one of fact for the jury." (*Johnson* v. *Southern Pacific R. R. Co.*, 154 Cal. 285, [97 Pac. 520]; *Seller* v. *Market St. Ry. Co.*, 139 Cal. 268, [72 Pac. 1006]; *Herbert* v. *Southern Pacific Co.*, 121 Cal. 227, [53 Pac. 651].)

Finally, it is to be pointed out that, while in every case of a true conflict in evidence the determination and decision is for the jury, the conflict must, in fact, be real. This has application to that class of cases where the plaintiff, struck by an approaching train, testifies that he did look, and did listen, and did not see, and did not hear, the approaching train; yet all the other evidence, including the physical facts and conditions is such as necessarily forces the conclusion, either that he did not look and did not listen (or he must have seen or heard the train), or that, if he did look and did listen, he looked with unseeing eyes and listened with unhearing ears. This is in accord with the general rule touching the weight of evidence that neither court nor jury is

CLX Cal.—16

bound by the mere declaration of a witness—no matter how improbable, incredible, or impossible, that declaration may be. It is a principle recognized in all cases. (*County of Sonoma* v. *Stofen*, 125 Cal. 35, [57 Pac. 681]; *Quock Ting* v. *United States*, 140 U. S. 417, [11 Sup. Ct. 733, 851, 35 L. Ed. 901]; *The William Gray*, 1 Paine (U. S.) 116 Fed. Cas. No. 17,694]; *Nelson* v. *Betts*, L. R. 5 Eng. Ir. App. Cas. 1, 20.) The matter is briefly and vigorously summed up by Lord Stowell, in The Odin, 1 A. Rob. 248, when he says:—

"It is a wild conceit that any court of justice is bound by the mere swearing; it is swearing credibly that is to conclude its judgment."

In railroad damage cases, as in all other classes and kinds of cases, this rule has been applied when and as in the judgment of the judges it should be applied. And it is sufficient to refer to such cases as *Hook* v. *Missouri Pac. R. Co.*, 162 Mo. 569, [63 S. W. 360]; *Artz* v. *Chicago etc. R. Co.*, 34 Iowa, 154; *Browne* v. *New York Central R. Co.*, 87 App. Div. 206, [83 N. Y. Supp. 1028]; *Fox* v. *Pennsylvania R. Co.*, 195 Pa. St. 438, [46 Atl. 106]; *Chicago etc. Ry. Co.* v. *Kirby*, 86 Ill. App. 57; *Peters* v. *Southern R. Co.*, 135 Ala. 533, [33 South. 332]; *Wardner* v. *Great Northern Ry. Co.*, 96 Minn. 382, [104 N. W. 1084]; *Chicago etc. Ry. Co.* v. *Andrews*, 130 Fed. 65, [64 C. C. A. 399]; *Blumenthal* v. *Boston etc. R. Co.*, 97 Me. 255, [54 Atl. 747]. The subject is well summarized by the supreme court of Missouri in *Hook* v. *Missouri Pac. R. Co.*, 162 Mo. 569, [63 S. W. 360], as follows:—

"When to look is to see, the mere utterance that one did look and could not see, will be disregarded as testimony by the court, and no additional value is to be given to the utterance because of the fact that a jury, under the direction of the trial court, has predicated a finding thereon. As the law does not permit a witness to blind his eyes to the sight of an approaching train in full view of a crossing he is to pass, neither will the eye of the law become blinded to the true situation of the case merely because of the absurd statement of a witness or witnesses, 'I looked and could not see,' or the jury's indorsement of it by a finding predicated thereon, when to look was to see."

It is in the category of the cases last referred to that appellants insist the case at bar belongs. Their contention,

in brief, is that, giving all the credit to plaintiff's testimony to which it is entitled, the physical facts and circumstances demonstrate that he could not have met with the accident without contributing fault of his own. We are thus brought to a consideration of the evidence, and, since the jury's determination from that evidence was the exoneration of plaintiff from the charge of contributory negligence, we must, in considering it, bear in mind that, of the reasonable inferences which the evidence will bear, those supporting plaintiff's contention are to be regarded as having been adopted by the jury.

The accident occurred about half past nine o'clock in the evening of July 12th. Plaintiff's occupation was the breeding and training of trotting horses. He was expecting certain of his horses by railroad, and was going with a companion to the railroad yards to see whether they had arrived. The two were proceeding westerly along the southerly line of Tulare Street, a public highway in the city of Fresno. Tulare Street crosses the right of way of the defendant company at practically right angles thereto—the street extending east and west, the railroad tracks north and south. Tulare Street is the main artery leading from the city proper to the west side (meaning west of the railroad tracks), which was plaintiff's destination. Tulare Street, going from the east side to the west side, crosses eight lines of track in the freight yards of the Southern Pacific Company. There are varying distances between these lines of track. Numbering these tracks successively, and naming the easterly one, track 8, there were about twenty-eight feet between track 8 and 7, about twenty feet between track 7 and 6, about thirteen feet between track 6 and 5, and about fifty-eight feet between track 5 and 4. It was while crossing track 5 that plaintiff was injured. Plaintiff, with his companion, had proceeded along the southerly line of Tulare Street, across track 8, track 7, and track 6, and was struck by a box car which with two other cars was being pushed ahead of a freight engine from the south, northerly along track 5. No gates were maintained at Tulare Street, and the flagman was over near track 4, fifty-eight feet west of track 5. Upon track 4, at this time, was a freight train, several blocks in length, extending completely across Tulare Street. The engine

was attached, the train was about ready to proceed and the flagman was talking to some men at or near this freight train. The night was dark. An electric light about thirty feet above the street, was located on the southerly curb line of Tulare Street between tracks 7 and 8, and about sixty feet from the point of the accident, but "it was not a very good light." Nothing else illuminated the scene. The shadows were deepened by warehouses to the south of and on the westerly side of Tulare Street, and by freight cars standing here and there upon the easterly and westerly tracks. It was the busy season of the year in the Fresno freight yard, and there were a number of such cars standing about. The effect of the electric light on one standing in its radiance and looking out was to intensify the outer gloom as it is intensified to one looking from a lighted room into the outer darkness. The tracks to the south of Tulare Street seemed all to stretch away in clear cut parallel lines, but a lead track, or "lead," used for convenience in switching cars from one track to another, extended in a long diagonal from track 2 at the warehouses of the Earl Fruit Company, about eight hundred feet south of Tulare Street, northerly, cutting at an acute angle tracks 3 and 4, and coming into track 5 at a point fifty-nine feet southerly from the southerly curb line of Tulare Street, and forty-five feet southerly from the southerly property line of Tulare Street. It was up this lead and into track 5 that the car which struck the plaintiff was propelled. At the place where Zibbell was struck, as he approached track 5, and under the conditions there existing, there was nothing to call one's attention to the existence of this lead into track 5, and the lead itself, and its connection with track 5, were obscurely visible, if visible at all. Plaintiff's testimony is that it was a very dark night. He and his companion Mc-Mahan, on approaching the railroad tracks from the east, stopped and looked them up and down. They saw and heard the freight train in front of them on track 4. They heard the noise of two engines working—one the freight train engine, the other seemingly a switch engine to the south. They could see the engine of the freight train on track 4. They could hear the puffing of the switch engine to the south, and judged it to be a block and a half away. Plaintiff had no knowledge of the tracks or their condition other than was

afforded by his inspection on that night. He did not know of the existence of the lead from track 2, where the freight engine then was, to track 5, upon which he was struck. Just before reaching track 5, at a distance of about three feet from the first rail, he and his companion came to a stop, and again glanced up and down the tracks, which seemed perfectly clear. They were then standing, however, in the glare of the electric light. Plaintiff looked down the track and could see no light. The tracks which he could see and so far as he could see them were clear. Then as he walked on, hearing the sound of a locomotive in front, he looked in that direction. This locomotive was attached to the freight train, and was in the act of starting the train to proceed on its journey. It made much noise. No noise from the south was audible. No bell was rung, no whistle was sounded, no warning shouted, no lantern or other light displayed, when suddenly he and his companion were struck by the box car which, as has been said, with two other cars, had been pushed along the eight hundred-foot lead on to track 5 by an engine placed at the far end of the cars, which engine itself was not puffing or using steam, but, after, having given momentum to the cars by the use of steam, under the headway thus gathered, was silently "drifting along."

Even in this brief statement it must be apparent that this case differs radically from those where all of the other evidence contradicts the plaintiff's testimony that he did look and listen, by establishing that, if he did look or listen, he must have seen or heard. The evidence in this case as to the existing conditions is not even that of plaintiff alone. His statements are supported by disinterested witnesses bearing testimony to the same facts. In addition, the evidence shows, though under conflict, that these cars were not only being thus silently propelled across the public highway in the night-time, but that the approaching car carried no warning light of any kind, nor even a brakeman to give a warning, the brakeman seemingly having dropped off to turn the switch to make the connection between the lead and track 5. Plaintiff, in glancing down the tracks and using both sight and hearing, could not see, for the absence of a train light; could not hear, because of the silence of the train, the failure to ring the bell or sound the whistle, and

the noise which the freight train and its engine on track 4, immediately in front of him, were making. The situation was further complicated by reason of the fact that the track which he was about to cross was, in fact, clear, and there was nothing to direct his attention to the fatal circumstance that the lead sixty feet away was bringing unlighted freight cars swiftly and silently on to the clear track for his destruction. We say "swiftly," for, while the estimated speed of the train as given by a witness was "about 9 or ten miles an hour," yet, taking into consideration the evidence of defendants that the train was checked as soon as possible upon discovery of the accident, the evidence as to the time and place of the discovery, the evidence as to the distance within which that train going at a given rate of speed could be checked, and the distance which the train actually traversed beyond the place of the accident before it was stopped, all would justify an inference that the rate of speed was even greater than that estimated by the witness. Appellants seek by a mathematical calculation and demonstration to show that plaintiff could not have looked to the southward, when standing at the place he designates, or he would have seen the approaching train. The argument upon this point cannot, in the nature of things, be conclusive. It cannot serve to remove the case from the domain of questionable fact which is the jury's province, to that of positive demonstration, where alone the law withdraws the consideration from the jury.

Under this statement we think it unnecessary to enter upon an elaborate exposition of the conflicting evidence. Suffice it to set forth brief extracts from the testimony of two of the witnesses, Brooks and Cochrane. Brooks says: "Prior to the time I turned around, having heard the noise, I did not hear any one call out, only the freight pulling out, just about to pass when they got run over, the freight to Mendota. I did not see any signals given there at that time." Cochrane says: "When I looked I was about eighty feet away. I saw this train of cars backing up there with no light on the back car and I heard no warning at all, nobody hallooed and no warning was given. I am sure of that. The cars were rolling upon the Tulare Street crossing as I looked up. I saw Mr. Zibbell and Mr. McMahan walking

along together, no noise being made, nothing to warn the men at all as they walked along, they walked right square into a death trap which caught them."

Clearly, therefore, the question of the contributory negligence of plaintiff was properly submitted to the jury, and the case belongs in the category of those like *Henavie* v. *New York Central R. R. Co.,* 166 N. Y. 280, [59 N. E. 901]; *Calwell* v. *Minneapolis Ry. Co.,* 138 Iowa, 32, [115 N. W. 605]; *Meyers* v. *Central Ry. Co.,* 218 Pa. 305, [67 Atl. 620]; *Sullivan* v. *New York etc. Ry. Co.,* 73 Conn. 203, [47 Atl. 141]; *Baltimore Ry. Co.* v. *State,* 104 Md. 76, [64 Atl. 304]; *Baltimore etc. Ry. Co.* v. *Cumberland,* 176 U. S. 232, [20 Sup. Ct. 380, 44 L. ed. 447]; *Johnson* v. *S. P. R. Co.,* 154 Cal. 285, [97 Pac. 520]; and *Antonian* v. *S. P. Co.,* 9 Cal. App. Rep. 718, [100 Pac. 877].

The employees of the defendant railroad who were made parties defendant in this action are M. C. Williams, foreman of the "switching crew" in charge of the train which caused the injury, G. E. Lawrence, the engineer of the locomotive engine, and F. M. Pope, a brakeman. It is insisted that the verdict and judgment against Lawrence and Pope are unsupported by the evidence, Lawrence, however, was the engineer. It is inferable from the evidence, and must have been inferred by the jury from their verdict, that he was operating his train as it approached the crossing, without bell or whistle, that he was moving at undue speed, that he was coming into a straight track from a dangerous side lead, and that by reason of the cars and of the angle of this lead he could not himself see the conditions in front of his train. There was sufficient in this to uphold the verdict and judgment. It does not, however, appear that defendant Pope was responsible. True, he was a member of the switching crew, but his position was a subordinate one. He was a brakeman. It does not appear that he had the slightest control over the acts of his fellows, or that he was in authority to do other than what he might be directed to do. It is not perceived that he failed in any duty which the law exacted of him. Not being responsible for the conduct of his fellow employees, not being in such supervision or control over them that the doctrine of *respondeat superior* could apply, Pope could be responsible only for his own personal negligence, and such negligence has not been shown. Against him, therefore, this judgment may not be sustained.

But the contention of appellant that from this the whole judgment must be reversed, under the common-law rule that where an entire judgment against several joint tort feasors must be reversed as to one it must be reversed as to all, is not sound. The early rule has been relaxed by judicial decision and modified by statute. And in this state it does not exist. (Code Civ. Proc., secs. 578, 579; *Nichols* v. *Dunphy*, 58 Cal. 605; *Fowden* v. *Pacific C. S. Co.*, 149 Cal. 151, [86 Pac. 178]; *Cole* v. *Roebling Construction Co.*, 156 Cal. 443, [105 Pac. 255].)

It was shown that plaintiff had experience and skill in the breeding and training of standard bred trotting horses. Plaintiff's father, an expert in the same business, was asked: "In 1906 what was the salary paid to trainers possessing the skill and experience of your son." Over objection and exception he answered: "Well, the least I ever heard was $2500, any professional trainer, from that up." Plaintiff also was permitted to testify: "It (the salary) varies from $2,000 to $2,500 up to $8,000 and $10,000 a year." These questions were directed— not to the prospective profits of a business, but to the loss of earning capacity of the plaintiff by reason of his injuries. The answers, if admissible at all, were therefore admissible under the plea of general damage. Not going to the element of prospective profit from a business they did not come within the rule of *Lombardi* v. *California St. Ry. Co.*, 124 Cal. 319, [57 Pac. 66].

We think the evidence was properly admitted, its weight, of course, being for the jury. The plaintiff had proved what was his chosen vocation in life, and the nature of his skill and experience in following that vocation. The jury, in ignorance of the salary, emoluments, and financial returns going to one pursuing this vocation, were entitled to be advised upon the matter. This did not mean, and it cannot be supposed that the jury construed it to mean, that they were from this evidence to say that, if incapacitated by his injuries, the plaintiff lost twenty-five hundred dollars, or six thousand dollars, or ten thousand dollars a year, but they were entitled to consider that if wholly incapacitated, he was excluded from the field of activity in which the usual compensations and rewards to men of his knowledge and experience reached a maximum of ten thousand dollars a year. The evidence was within the pur-

view of the rule declared in *Treadwell* v. *Whittier,* 80 Cal. 575,
[13 Am. St. Rep. 175, 5 L. R. A. 498, 22 Pac. 266]; *Bonneau*
v. *North Shore Ry. R. Co.,* 152 Cal. 413, [125 Am. St. Rep.
68, 93 Pac. 106]; *Shaw* v. *S. P. Co.,* 157 Cal. 242, [107 Pac.
108]; *Fisher* v. *Jansen,* 128 Ill. 549, [21 N. E. 598]; *Rayburn*
v. *Cent. Iowa Ry. Co.,* 74 Iowa, 644, [38 N. W. 521]; *Missouri
etc. Ry.* v. *St. Clair,* 21 Tex. Civ. App. 345, [51 S. W. 666];
*Peterson* v. *Seattle Traction Co.,* 23 Wash. 615, [53 L. R. A.
586, 63 Pac. 539, 65 Pac. 543]; *Southern Pacific Co.* v. *Hall,*
100 Fed. 760; *Northern Pac. Ry. Co.* v. *Wendel,* 156 Fed. 336,
[84 C. C. A. 232]. The rule is that under the plea of general
damages and to prove a loss of earning capacity, it is permis-
sible to show what wages, salary, or emoluments, would be open
to the plaintiff in a busines, vocation, trade, or profession
which he understands, and which he would have the right and
ability to follow were it not for his incapacitating injuries.
In this view the evidence was pertinent and permissible. It
bore directly upon an occupation for the pursuit of which
plaintiff had shown himself fitted and qualified and which he
was following; and the rule as we have stated it is not at all
in conflict with the other rule which forbids testimony of mere
hopes or mere prospects of advancement, the rule declared in
such cases as *Richmond & Danville R. R. Co.* v. *Elliott,* 149
U. S. 266, [13 Sup. Ct. 837, 37 L. Ed. 728]; and *Richmond etc.
Ry. Co.* v. *Allison,* 86 Ga. 145, [12 S. E. 352, 11 L. R. A. 43].
Thus in the former of the two cases just cited, the obnoxious
evidence was to the effect that the plaintiff "thought he would
be promoted" and "if promoted would receive an increased
salary." In holding this evidence inadmissible the supreme
court of the United States declared that: "Promotion was
purely a matter of speculation, depending not simply upon the
occurrence of a vacancy, but upon the judgment or even whim
of those in control." In the latter case, where like testimony
was introduced, the supreme court of Georgia very properly
says: "To allow the jury to assess damages in behalf of the
plaintiff on the basis of a large income arising from a public
office which he has never received, which is merely in expect-
ancy and might never be received, or if receivd at all, might
come to him at some remote and uncertain period, would be
wrong and unjust to the defendant."

The witness, Hamilton, was asked the following question:—

"Did Mr. Cowley tell you in discussing this case that he. had testified before the coroner's jury that he saw that train come to a dead standstill before reaching that switch and saw Williams climb down off the side-step in front of the train, turn that switch and come back again and give the signal to go ahead, and climbed up again?"

After objection overruled and exception taken, he answered in the negative. As disclosed by the record the question was improper. It does not appear to have been designed for impeachment, or for any other permissible purpose; but the answer was in the negative, the inquiry was collateral, plaintiff was foreclosed by the answer, no attempt was made to follow the question and introduce the matter in evidence, and it is clear that injury was not worked to defendants.

The same witness, Hamilton, being interrogated as to the distance travelled by the train after the signal to stop, there was read to him the testimony upon this point which he had given at the coroner's inquest. On re-direct examination defendants' attorney offered in evidence all of the witness's testimony given at the inquest. It was refused admission, and it is contended that this ruling was error under the familiar principle enunciated in the code, that when part of an act, or declaration, or conversation, or writing, has been given in evidence, all of it may be shown. But this rule is, of course, subject to the very proper limitation expressed in section 1854 of the Code of Civil Procedure, that it is all "on the same subject," which may be developed and put in evidence. Thus, defendants were entitled to all of the testimony from Hamilton's deposition, bearing upon the single question concerning which he was interrogated,—namely: the distance travelled by the cars; but they were not entitled to the introduction in evidence of other different and extraneous matter which the deposition contained. The ruling was therefore proper. (*Vance* v. *Richardson*, 110 Cal. 414, [42 Pac. 909].)

Complaint is made of an instruction which states to the jury that, "If you believe from the evidence that the plaintiff sustained the injuries complained of in his complaint, through the carelessness and negligence of the defendant, without negligence on his part, then you should find for the plaintiff, Willard R. Zibbell, and assess the damages in such sum as you believe, under all the circumstances of this case in evidence, the

plaintiff ought to recover, not exceeding the amount claimed in said complaint."

The instruction is criticised upon the ground that it authorizes the jury to assess damages in such sum as they believed plaintiff should recover, whereas the jury could only assess such damages as under the evidence would compensate plaintiff for the detriment proximately caused. (Civ. Code, secs. 3281, 3333.) This was but one instruction. The jury was repeatedly, accurately, and carefully instructed that, "the measure of damages is the amount which will compensate plaintiff for all the detriment proximately caused by the accident." As employed in the instruction, the use of the word "believe" in connection with "all the circumstances of the case in evidence," was a clear equivalent to the words "find" or "determine," and could not have misled the jury into the misconception that they were entitled to award anything other than compensatory damages in an amount established to their satisfaction by the evidence. Herein the case differs essentially from that of *Fries* v. *American Lead Pencil Co.*, 141 Cal. 610, [75 Pac. 164], where the one vital instruction upon the question of damage was an instruction to the jury that it was their "duty" to "give the child such amount of damages as you feel it is entitled to." For under the Fries case the instruction was positive that it was the *duty* of the jury—not to give damages in compensation for the injuries, but to give such damages as through their feelings, and not through their judgment, upon the evidence, they thought the child should have. . . .

By one instruction the jury was told that it could not consider the profits of any business in which the plaintiff may have been engaged, in estimating the amount of his damage. In another instruction they were told that they could consider, in estimating plaintiff's damage, the loss of the earnings which he would have earned, if any, by reason of his injuries. It is contended that these instructions are in radical conflict. But we do not so view them. Plaintiff, not having charged in special damage for loss of profits, the jury was properly instructed that this element of special damage should not enter into their computation. But, upon the other hand, a loss of earnings—a direct loss, as distinguished from profits—a special and prospective loss—was a loss which the jury could properly consider under the general *ad damnum* clause. *Treadwell* v.

*Whittier,* 80 Cal. 575, [13 Am. St. Rep. 175, 5 L. R. A. 498, 22 Pac. 266]; *Bonneau* v. *North Shore R. R. Co.,* 152 Cal. 413, [125 Am. St. Rep. 68, 93 Pac. 106].)

Toward the close of the trial suggestion was made that the jury visit the scene of the accident. Discussion between counsel followed as to whether the visit should be made in the daytime or at night, under circumstances as nearly as possible like those existing at the time of the accident. The court then asked the jurors to indicate if they wished to view the premises. No juror seemingly so desired. The following then took place:—

"Mr. Cory: I think in any event they ought to go down there and look at the conditions.

"Mr. Roche: I am perfectly willing to stipulate now that they may go down there at any time or under any circumstances and observe the conditions, the tracks together or alone or any other way.

"Juror Bennett: I think, if the court please, the majority of the jury have been down there, not together, but separately.

"Mr. Cory: Do I understand that you have been down there?

"Mr. Bennett: No sir, not at one time, I was there."

Upon this showing neither party made any objection to the conduct of the jury, nor suggested, nor asked any action upon the part of the court. It is now contended that the misconduct of the jury was such as to necessitate a new trial. All that appears is shown by the statement, and not by affidavits. Respondent insists that the matter not having been presented upon affidavits is not cognizable by this court. Section 657 of the Code of Civil Procedure provides that a new trial may be had:—

"1. For irregularity in the proceedings of the court, jury, or adverse party, . . . by which either party was prevented from having a fair trial."

Section 658 of the same code declares that: "When the application is made for a cause mentioned in the first . . . subdivision of the last section, it must be made upon affidavits." (See *Benjamin* v. *Stewart,* 61 Cal. 608; *Saltzman* v. *Sunset T. & T. Co.,* 125 Cal. 501, [58 Pac. 169]; *Gay* v. *Torrance,* 145 Cal. 144, [78 Pac. 540].)

The present case, however, is distinguishable from the cases

cited, in that the asserted misconduct appears as fully of record in the statement on appeal as it could be made to appear by affidavits. But we need not pause to consider whether the rule prescribed by section 658 of the Code of Civil Procedure is designed to apply to a case such as this. For upon the merits we do not think that the appellants' proposition can be sustained. Juror Bennett's declaration to the effect that a majority of the jury had visited the scene of the accident was hearsay, as he further states that they did not go there in a body but separately. His declaration then amounts merely to a statement that he himself visited the spot. This was made known to the appellants during the progress of the trial, and yet no action was taken, and no suggestion made that the court should take any steps to correct any apprehended injury. Both parties to the action seemed desirous that the jury should visit the premises, and the statement that they had done so was apparently accepted and acquiesced in without demur as a substitute for a formal visit under direction of the court. That this was irregular may not be doubted, but that it was injurious is a very different proposition. And in this state, and in many other states, the rule is that when knowledge of such irregularity is made known in time to apply to the court to remedy or correct it, a party may not sit by in silence, taking chances of a favorable verdict, and after a hostile verdict, then, for the first time, be heard to complain. In *People* v. *Hope*, 62 Cal. 291,—a criminal case—it was held that the bare fact that a juror had visited the premises where the crime had been committed, was not sufficient ground for discharging the jury. In *Sheehan* v. *Hammond*, 2 Cal. App. 371, [85 Pac. 340], defendant and his counsel, knowing of an asserted irregularity upon the part of the jury, failed to call the court's attention to it, but made their objection after the trial was over, and it was said :—

"The defendant cannot be allowed to remain quiet and take the chances upon a favorable verdict, and then raise a point that he knew of and could have raised during the progress of the trial." This declaration is abundantly supported by our other decisions, as witness: *Monaghan* v. *Rolling Mill Co.*, 81 Cal. 194, [22 Pac. 590] ; *Wood* v. *Moulton*, 146 Cal. 317, [80 Pac. 92] ; *Doolan* v. *Omnibus Cable Co.*, 140 Cal. 375, [73 Pac. 1060]. And in other jurisdictions the construction to this

effect is so uniform that it is laid down as a rule in the following language in 17 American and English Encyclopedia of Law, page 1206 :—

"Failure to object to the misconduct of jurors as soon as knowledge thereof is obtained and opportunity to object is presented is a waiver of the right to object, and the objection cannot be thereafter presented, as by a motion for a new trial."

The jury's verdict in favor of the plaintiff was for the sum of one hundred thousand dollars. Upon motion for a new trial, the court, with consent of the plaintiff, remitted thirty thousand dollars of this amount. These appeals are taken, therefore, from a judgment in the sum of seventy thousand dollars. It is contended that the damages are so excessive as to force the conclusion that they were given under the influence of passion and prejudice. And herein it is said that the verdict is twice the amount of the largest judgment ever rendered in the state of California in a similar case, and is the largest verdict ever presented to an appellate court for review. It has been decided by this court that the only means of discovering the existence of passion and prejudice as influencing a verdict is by comparing the amount of the verdict with the evidence before the trial court. To say that a verdict has been influenced by passion and prejudice is but another way of saying that the verdict exceeds any amount justified by the evidence. (*Doolan* v. *Omnibus Cable Co.,* 140 Cal. 375, [73 Pac. 1060].) Damages in cases such as this are not liquidated. No fixed amount may be recovered, no exact proof of any fixed amount can, from the nature of the case and of the elements which enter into the award of damage, ever be made. The principal elements of damage for which compensation may be awarded are the physical and mental suffering caused and which will be caused by the injury, and the partial or total impairment of earning capacity likewise caused by the injury. To the latter the law may apply a measure—a rude and inexact measure it is true, but still a measure. The extent of the partial loss of earning capacity, the duration of that partial loss of earning capacity, the total loss of earning capacity, and the earning capacity of the plaintiff himself, may all be approximated with reasonable exactness. But to put a monetary value upon the elements of physical pain and mental suffering,

their nature, extent, and continuance, is a much more difficult and delicate matter. It is, of course, improper for the jury to attempt to measure the damage occasioned by the injury and the sufferings attendant upon it, by asking themselves what sum they would take to endure what the plaintiff has endured, and must endure. Says the supreme court of Wisconsin in *Heddles* v. *Chicago & Northwestern Railway Co.*, 74 Wis. 239, [42 N. W. 237] : "No rational being would change places with the injured man for an amount of gold that would fill the room of the court, yet no lawyer would contend that such is the legal measure of damages." Appellate tribunals have frequently been called upon to review verdicts under the objection here presented. It is by this court said to be the correct rule, "that it is only where the verdict is so grossly disproportionate to any reasonable limit of compensation warranted by the facts, as to shock the sense of justice, and raise at once a strong presumption that it is based on prejudice or passion rather than sober judgment, that the judge is at liberty to interpose his judgment as against that of the jury." (*Harrison* v. *Sutter St. Ry. Co.*, 116 Cal. 156, [74 Pac. 1019].) Viewing the evidence in contemplation of this principle of law, the character of the injuries to plaintiff first call for mention. Those injuries are admitted by the pleadings, and are as follows :—

"His left arm was crushed and torn below the shoulder; his right hand and wrist were crushed and torn; his left foot and ankle were crushed; the bone of one of the toes of his right foot was broken and crushed; his right heel was crushed and torn to such an extent as to almost sever it from the foot; his right leg was fractured between the knee and ankle, and the flesh on said right leg between the thigh and ankle was torn, cut, bruised and lacerated; his back, sides and shoulders, face and head were cut, bruised and wounded, and he sustained a severe nervous shock. By reason of said injuries to said left arm, it became necessary to amputate the same, and the said arm was on said 12th day of July, 1905, amputated below said shoulder. By reason of said injuries to said left foot, it became necessary to amputate the same, and the said left foot was on said last mentioned date amputated a short distance above the ankle. By reason of said injuries to said right hand and wrist, it became necessary to amputate the said right hand

at the wrist, and the said right hand was on the 13th day of July, 1905, amputated at the wrist. By reason of said injuries, plaintiff has suffered, and will continue for a long period of time to suffer great pain and mental anguish."

At the time of these injuries plaintiff was twenty-seven years old, in perfect health, of robust constitution, skilled and experienced in the breeding and training of horses, earning about twenty-five hundred dollars a year in that vocation, and with a reasonable expectation and fair prospect of an increase of earning capacity and a betterment of financial conditions within his chosen vocation. By the accident his condition is changed from one of virile activity and competency to helpless incompetency. There is no occasion to·picture the pain, the grief, the mortification, the disfigurement, and the helplessness which have resulted, all of which will continue through the rest of his life, a period, within the mortality tables, of more than thirty-eight years. And so it must be said that, while the damages awarded in this case are very great, the shocking character of the injuries, the loss of both arms and one leg, the permanent loss of earning capacity, the inevitable disabilities and the suffering endured, and necessarily to be endured, for more than thirty-eight years, present a case where the injuries are as grave as the damages are great, or at least, a case where there is no such marked disproportion between the character of the injuries and the award made for them as to suggest at once that the award was influenced by prejudice, passion, or corruption.

For which reasons the judgment and order as to defendant Pope are reversed and as to the other defendants they are affirmed.

Melvin, J., Lorigan, J., Shaw, J., Angellotti, J., and Sloss, J., concurred.

Rehearing denied.